SAINT PAUL SURPLUS LINES INS. CO., Appellant,

v.

GEO PIPE CO. and Geo Int'l Corp., Appellees.

No. 01–98–00294–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 10, 2000.

---

J. Stephen Gibson, Michael Wallace Huddleston, Keren Keltz, Dallas, for Appellant.

J. James Cooper, Stacy R. Obenhaus, Marie R. Yeates, Gwen Samora, Houston, for Appellee.

Panel consists of Chief Justice SCHNEIDER, and Justices ANDELL and DUGGAN.[*]

**OPINION ON REHEARING**

LEE DUGGAN, Jr., Justice (Retired).

Appellant has filed a motion for rehearing. That motion is denied. However, we withdraw our opinion dated April 20, 2000 and substitute this opinion in its place.

This is an appeal of a plaintiff's summary judgment in favor of the insured appellees, Geo Pipe Company ("Geo Pipe") and its corporate parent, Geo International Corporation ("Geo International"), in an insurance coverage dispute with appellant, St. Paul Surplus Lines Insurance Company ("St.Paul"), appellees' general liability insurer.

Geo International contracted with St. Paul in Illinois for insurance coverage ("the St. Paul policy") for itself and its subsidiaries and related affiliates. Several months after the St. Paul policy was issued, Geo International added Geo Pipe as a named insured, effective October 1, 1992. Most of Geo Pipe's business is done in Texas and Louisiana.

Prior to the St. Paul policy's effective date, Geo Pipe sold chrome tubing to Walter Oil & Gas Corporation ("Walter Oil") to be delivered to Galveston, Texas and installed in Walter Oil's offshore well.

[*] The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

In May 1992, Walter Oil personnel detected a problem with constant pressure in the well.[1] In July 1992, Walter Oil performed an initial "workover" and replaced the seals in the well's tubing. By August 1992, still before the effective date of the St. Paul policy, the pressure problem had returned. Walter Oil eventually took corrective action in March 1993, discovered a hole or "washout" in a joint of the tubing, and replaced the tubing.

Walter Oil demanded $1,628,348 from Geo Pipe for its workover costs of removing and replacing the tubing. Geo Pipe first reported Walter Oil's claim to its insurers before the effective date of the St. Paul policy. When the prior insurers disputed that the loss occurred during their policy period, Geo Pipe forwarded the claim to St. Paul, which declined coverage.

Walter Oil sued Geo Pipe in 1994, alleging breach of contract, breach of express and implied warranties, and negligence in supplying defective tubing. Walter Oil sought damages for (1) shutdown of the well; (2) removal of defective tubing; (3) purchase and installation of replacement tubing; and (4) lost profits incurred from loss of production.

Before the suit went to trial, Geo Pipe declared bankruptcy. Under the bankruptcy court's supervision, Geo Pipe assigned its claim against St. Paul for breach of contract to Walter Oil in exchange for Walter Oil's agreement to satisfy any judgment against Geo Pipe solely from liability insurance proceeds. The case was never tried. Instead, in a proceeding contested by St. Paul as part of this appeal, Walter Oil and Geo Pipe entered an agreed judgment against Geo Pipe, approved by the trial court, awarding Walter Oil $1,800,000 in damages.

As Geo Pipe's assignee, Walter Oil then sued St. Paul and Geo Pipe's prior insurers and filed a motion for summary judgment against St. Paul on Geo Pipe's breach of contract claim. After a hearing, the trial court (1) determined that all issues between Geo Pipe and St. Paul were governed by Illinois law, (2) granted the summary judgment in favor of Walter Oil as assignee, and (3) awarded $1,000,000 in damages, $149,158.13 in prejudgment interest, and post-judgment interest. The trial court severed and abated the remaining causes of action against St. Paul and the prior insurers pending the resolution of this appeal.

On appeal, St. Paul asserts in its first point of error that the trial court erred in granting summary judgment on the breach of contract claim because St. Paul had no duty to defend Geo Pipe under the policy.

The parties agree that construction of the policy language and the determination of a duty to defend is the same under Texas and Illinois law, and that choice of law analysis is relevant only to the effect of a breach of contract if a duty to defend is found. We therefore construe the policy and analyze St. Paul's duty to defend un-

---

1. James Looke, a representative of Walter Oil, testified in a deposition that three days after the well originally went on production, Walter Oil noticed an increase in casing pressure in the well. He said that the casing pressure should ordinarily be lower than the pressure in the well's pipe. He also testified that a well with increased casing pressure could continue to be used, "but it's not a safe situation to have." He stated that Walter Oil employees originally attributed the pressure to a problem with leakage in the seals, threads, or packer, though ultimately they discovered a hole in the pipe tubing. His final analysis of the cause of the problem was that "the pressure went up due to the hole in the pipe, and the hole probably started off as a small leak and then got bigger and bigger and bigger." He also conceded that although Walter Oil could have worked over the well to determine the cause of the pressure problem from November 1992 through March 1993, it kept operating the well until March because of high gas prices during the winter. Though our analysis in this opinion is confined to Walter Oil's pleadings in its suit against Geo Pipe and to the language of the St. Paul policy, we set out this testimony as helpful background information.

der Texas law.[2]

■ Texas courts apply the "eight corners" rule to determine whether the duty to defend applies—*i.e.*, the Court compares the plaintiff's pleading allegations to the provisions of the insurance contract, without regard to the facts that eventually come out during discovery and trial. *See National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997); *Texas Property and Cas. Ins. Guar. Assoc. v. Southwest Aggregates, Inc.*, 982 S.W.2d 600, 604 (Tex. App.—Austin 1998, no pet.).

■ The duty to defend and duty to indemnify are distinct and separate. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821–22 (Tex.1997). The duty to defend arises when the plaintiff alleges facts that *potentially* support claims for which there is coverage. *National Union*, 939 S.W.2d at 141. The duty to defend is determined from the face of the pleading, without regard to ultimate truth or falsity of the allegations. *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 24 (Tex.1965). The focus of this inquiry is on the facts alleged, however, not on legal theories. *See Maayeh v. Trinity Lloyds Ins. Co.*, 850 S.W.2d 193, 195 (Tex.App.—Dallas 1992, no writ). Further, we "liberally construe the allegations in the petition in determining the duty to defend, resolving any doubt in favor of the insured," though we do not read any facts into the pleadings for that

purpose. *Trinity Universal*, 945 S.W.2d at 825.

### General policy coverage

The policy obligates St. Paul to pay amounts Geo Pipe "is legally required to pay as damages for covered bodily injury, property damage or fire damage that:

- happens while this agreement is in effect; and
- is caused by an event."

The policy defines an "event" as "an accident; including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" is defined as

- physical damage to tangible property of others, including all resulting loss of use of that property; or
- loss of use of tangible property of others that isn't physically damaged.

### Policy exclusions

■ The policy provides two relevant exclusions. First, the policy excludes damage "to any of your products (i.e. Geo pipe's tubing) that's caused by the product itself or by any of its parts." Second, the policy excludes "impaired property":

We won't cover property damage to impaired property, or property that hasn't been physically damaged, that's caused by;

- your faulty ... products or completed work; or

2. In its motion for rehearing, however, Walter Oil as Geo Pipe's assignee argues that our interpretation of the policy term, "sudden and accidental," is at variance with Illinois law, necessitating a new opinion with choice of law analysis to determine which forum's law governs the determination of the duty to defend. As will be explained below, whether under Texas or Illinois law, we find that this particular policy language would be interpreted the same way. In the absence of a true conflict of law, we do not undertake choice of law analysis. *See generally Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex.1984) (determining that, before undertaking choice of law analysis, the Court "must first deter-

mine whether there is a difference between the rules of Texas and New Mexico on this issue"); *Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 260 (Tex.App.—San Antonio 1999, no pet.) (initially determining whether there was a "conflict of law which would necessitate the trial court to decide a choice of law issue" before conducting choice of law analysis); *Hull & Co., Inc. v. Chandler*, 889 S.W.2d 513, 517 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (noting that a party must ordinarily cite the conflicting law of another forum "before undertaking a choice-of-law analysis so that the court can determine whether a true conflict of laws exists").

- a delay in fulfilling the terms of a contract or agreement.

The policy defines "impaired property" as

tangible property, other than your products or completed work, that can only be restored to use by:

- the adjustment, repair, replacement or removal of your products or completed work which forms a part of it; or

- your fulfilling the terms of a contract or agreement.

Thus, St. Paul's policy generally excludes coverage for (1) damages to Geo Pipe's own products (the tubing it sold to Walter Oil) or (2) property damage (defined as both physical damage and damages arising from loss of use) to a third person's impaired property (Walter Oil's well) caused by Geo Pipe's tubing.

### The exception to the exclusions

An exception to the application of these exclusions is that the policy will cover damages for the loss of use of a third person's property if caused "by sudden and accidental physical damage" to Geo Pipe's products:

[W]e won't apply this exclusion to damages that result from the loss of use of other property not physically damaged that's caused by sudden and accidental physical damage to your products or completed work after they've been put to their intended use. For example:

*You supply an electric motor to a customer who uses it to power his conveyor. The motor's shaft breaks several days later while he's operating the conveyor. The conveyor isn't damaged, but your customer has extra costs because he's unable to use it until the motor is repaired. If he sues you to recover those costs, we won't apply the exclusion. However, if the customer discovers while hooking the motor up to the con-*

*veyor that the motor's shaft is broken, we won't protect you.*

(Emphasis in the original).

### Walter Oil's allegations

Walter Oil alleged in its petition that it drilled the offshore well in the spring of 1992, commenced production in May 1992, and "[t]hereafter, and continuing through the winter of 1993, there was constant pressure in the casing." The petition alleged that the cause of the pressure was unknown, that Walter Oil properly used the tubing at all times, and that it discovered a hole or "washout" in a joint of the tubing during a workover in March 1993. The petition alleged that the tubing was chrome and had been welded, and that this "weld *corroded,* thereby causing the washout" (emphasis added). Walter Oil argued this product defect was a cause of the "failure of the tubing in question."

On appeal, St. Paul argues that Walter Oil's pleadings do not allege sudden and accidental property damage, while Walter Oil as Geo Pipe's assignee argues this exception was met by the allegation of a hole or washout in the tubing.

Two Texas decisions are helpful on the question whether a hole caused by corrosion is sudden and accidental. In *Pioneer Chlor Alkali Co., Inc. v. Royal Indem. Co.,* the Fourteenth Court of Appeals was faced with a duty to defend claim involving a chlorine liquifier that developed four holes in three of its tubes through corrosion, which in turn led to another corrosive hole in an elbow of downstream piping and resulted in the sudden release of 42 tons of chlorine into the atmosphere. *See* 879 S.W.2d 920, 925 (Tex.App.—Houston [14th Dist.] 1994, no writ). The insurance policy in question specifically excluded corrosion from coverage under the policy, but covered a "sudden and accidental breakdown" of the equipment in question. *Id.* The *Pioneer* court drew a distinction between corrosion damage and the sudden and accidental release of gas into the atmosphere:

[The insured] admits that the tubes damaged because of the direct steam of brine concentrated onto the tubes would not be covered because that damage is corrosion damage; however, the damage caused by the sudden and accidental release of forty-two tons of chlorine would be.

*Id.* at 934. The court also noted that, although corrosion was slow, the breach of the tubes fit the definition of sudden and accidental. *Id.* at 937.

To the extent that *Pioneer* held that the holes in the tubes constituted sudden and accidental physical damage, we disagree. A hole caused by corrosion is necessarily gradual. But a fairer reading of the *Pioneer* decision would be that although the tubes corroded gradually, the damage complained of was due to a sudden and accidental release of forty-two tons of chlorine as the tubes were breached. That is, though the corrosion ate away the tubes gradually, the release of chlorine was virtually instantaneous.

A case more closely on point with the instant situation is *Mesa Operating Co. v. California Union Ins. Co.*, 986 S.W.2d 749 (Tex.App.—Dallas 1999, pet. denied). In *Mesa*, the well casing in an underground well had corroded and allowed salt water to escape into a fresh water aquifer. *Id.* at 752. The well owner sought recovery from its insurer for its expenses to cure the aquifer and for damages to a landowner who used the aquifer, but the primary insurance policy excluded coverage for injury or property damage caused by pollutants or liquids unless caused by a "sudden and accidental" discharge. *Id.* at 754. After surveying the law of other states, the

*Mesa* court held that the term "sudden" has a temporal component; *i.e.*, that an event occur abruptly rather than simply unexpectedly. *Id.* at 755.[3] The court then addressed the argument that, even if the well casing was corroded gradually, the breach of the casing was instantaneous:

[The insured] argues that even if the word "sudden" is held to mean "quick" or "abrupt," the salt water contamination at issue happened "suddenly." [The insured] reasons that the discharge occurred suddenly because at one point in time the well was whole and, an instant later, salt water breached the well and began escaping into the aquifer. According to [the insured], the fact that the leak was not discovered for a lengthy period of time does not negate the temporal suddenness with which the breach occurred. This argument has been described as the "metaphysical moment" theory. Under the logic of this theory, every event or condition not existing from the dawn of time would be considered "sudden" because at one moment it did not exist and the next moment it did. While we agree that the time of discovery does not control whether the discharge was sudden, we also conclude that a discharge that continues over a lengthy period of time cannot be considered "sudden" as a matter of law. For example, if evidence showed that a container burst, releasing a finite amount of pollution into the surrounding area within a short period of time, this discharge could be considered sudden even though its existence was not discovered for several years. Contrastingly, a leak of a pollutant that continues long past the point of the ini-

---

3. The *Mesa* decision is the first Texas decision to reach this precise issue; the *Pioneer* decision never expressly addresses whether the term "sudden" implies a temporal component. *See Mesa*, 986 S.W.2d at 755–56 (discussing *Pioneer*'s analysis of the phrase "sudden and accidental"). Subsequently, the Austin Court of Appeals determined similarly that "the word 'sudden' clearly and unambiguously imparts a sense of temporal urgency"

in comprehensive general liability policies. *Gulf Metals Indus., Inc. v. Chicago Ins. Co.*, 993 S.W.2d 800, 807 (Tex.App.—Austin 1999, pet. denied). *See also Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.*, 76 F.3d 89, 92 (5th Cir.1996) (determining that, "[u]nder Texas rules of construction, ... 'sudden' must be read to include a temporal element").

tial release will not be considered sudden.

*Mesa*, 986 S.W.2d at 757 (citations omitted); *see also SnyderGeneral Corp. v. Century Indemn. Co.*, 907 F.Supp. 991, 1001 (N.D.Tex.1995), *aff'd in part and vacated in part on other grounds*, 113 F.3d 536 (5th Cir.1997) (concluding that the suddenness of discharge can be determined from the period of time that commences with the release of the contaminant and ends when the flow ceases).

The *Mesa* court ultimately determined the salt water pollution was not "sudden" because of evidence that the salt water from the underground well leaked into the aquifer for a period of years until it was discovered. *Mesa*, 986 S.W.2d at 757.

■ We agree with the *Mesa* court that the term "sudden" has a temporal component and that an ongoing condition of sufficient duration cannot constitute a sudden event.

Turning back to Walter Oil's pleadings and viewing the policy language in the light most favorable to the insured, Walter Oil's pleadings do not allege "sudden and accidental physical damage" within the meaning of the exception to the impaired property exclusion. Walter Oil's entire cause of action is premised upon Geo Pipe's having provided chrome tubing that corroded because it had been welded, resulting in a hole in the pipe. Corrosion has a commonly understood, unambiguous meaning; the verb "corrode" is defined as "to eat away by degrees as if by gnawing; *esp*: to wear away gradually usu. by chemical action." Webster's New Collegiate Dictionary, p. 253 (1981). Walter Oil's allegations establish that its claim is that the welded chrome tubing corroded—was eaten away by degrees, or wore away gradually—until a hole appeared. Such an allegation is one of physical damage that is incremental or gradual, the opposite of "sudden." Nor do Walter Oil's allegations

establish a (temporally) sudden and discrete event such as the abrupt release of 42 tons of chlorine in *Pioneer.* Rather, Walter Oil's pleadings allege "constant pressure" in the well casing after May 1992 and "continuing through the winter of 1993." This situation more closely resembles the continuous, non-sudden, release of saltwater after corrosion in the well casing in *Mesa.*

While Walter Oil urges that we construe its pleading that a hole appeared as a sudden and accidental event, its literal allegation is that physical damage to the pipe was by corrosion, resulting in constant pressure over a period of months. We cannot construe such damage to the tubing as sudden physical damage.

Walter Oil's loss was excluded because it was for property damage to Geo Pipe's products (pipe tubing) and "impaired property" (Walter Oil's well)—"tangible property . . . that can only be restored to use by . . . repair, replacement or removal of [Geo Pipe's] products or completed work which forms a part of it." Further, the loss was not within the policy's "sudden and accidental" exception to the application of these policy exclusions.

Application of the "eight corners" rule comparing Walter Oil's pleadings with the coverage provisions of St. Paul's policy insuring Geo Pipe shows that the loss was excluded under policy terms.

In its motion for rehearing, Walter Oil as Geo Pipe's assignee argues that an Illinois court would interpret "sudden and accidental" differently under Illinois law. Walter Oil points out that the Illinois Supreme Court has interpreted the words "sudden and accidental," in an insurance policy's pollution exclusion clause, as "unexpected or unintended," rather than "abrupt, rapid, or swift." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1218 (1992).[4] Walter Oil argues that this

---

4. Walter Oil also argues that the cases cited by this decision involve pollution exclusion

clauses and are inapplicable to Geo Pipe's appeal. However, the case it cites to show

Court, by applying a temporal requirement to the St. Paul policy's use of the term "sudden and accidental," has created a conflict with Illinois law that requires choice of law analysis to resolve.

*Outboard* is distinguishable from this case. The *Outboard* court found that the term "sudden" as used in that particular policy could be interpreted both as abrupt (temporal) and unexpected (non-temporal). *Id.* Resolving the ambiguity in the insured's favor, the court construed "sudden" as "unexpected or unintended," the non-temporal definition. *Id.* The *Outboard* court was careful, however, to limit its analysis to the facts and policy before it:

> We conclude that the two definitions of "sudden" set forth above are both reasonable interpretations of this term *in the context in which it appears.* Therefore, "sudden" is, at a minimum, ambiguous *as used in these policies.* In Illinois, ambiguities and doubts in insurance policies are resolved in favor of the insured, especially those that appear in exclusionary clauses. Consequently, *in this particular context,* we construe "sudden" in favor of OMC and find it to mean unexpected or unintended.

*Id.* (emphasis added, citations omitted).

In our case, we are presented not only with the term "sudden and accidental" but also with an example, within the policy, clarifying its meaning. As stated earlier, the policy provided the following example of a sudden and accidental event:

> You supply an electric motor to a customer who uses it to power his conveyor. The motor's shaft breaks several days later while he's operating the conveyor. The conveyor isn't damaged, but your customer has extra costs because he's unable to use it until the motor is repaired. If he sues you to recover those costs, we won't apply the exclusion.

However, if the customer discovers while hooking the motor up to the conveyor that the motor's shaft is broken, we won't protect you.

The example provided in the policy has two elements. First, the accident immediately (a temporal requirement) prevents the use of the third party's property—the customer's motor's shaft breaks and the customer is "unable to use [his property] *until* the motor is repaired." (Emphasis added). Second, the event must be unexpected (a non-temporal requirement)—if the customer "discovers" the problem ahead of time, the event is excluded. Under this policy, the term "sudden" is thus clarified to mean an abrupt (temporal) and unexpected (non-temporal) event—both senses of the word sudden. The *Outboard* court concluded that "sudden" was ambiguous because of dispositive meanings—*either* abrupt *or* unexpected—and construing the policy in favor of the insured, the court held that "sudden" required only that the event be unexpected. Under this policy, however, the policy example shows that a "sudden and accidental" event must be *both* abrupt *and* unexpected. Both are requirements that must be satisfied, and because of the policy example we are not at liberty to choose between them; even under Illinois law there is no ambiguity under this policy.

■ Texas courts have decided that the term "sudden" unambiguously contains a temporal element. *See Mesa,* 986 S.W.2d at 755; *Gulf Metals,* 993 S.W.2d at 807; *see also Mustang Tractor,* 76 F.3d at 92 (construing a policy's use of the term "sudden" under Texas law). But assuming, without deciding, that Illinois law applied to the St. Paul policy (and that corrosion resulting in a pressure problem, of which Walter Oil was aware before the policy's effective date, is truly an "unanticipated" event), we conclude an Illinois court would find the term "sudden and accidental," as

that the word "sudden" does not necessitate a temporal requirement, *Outboard,* involves a pollution exclusion clause. We find the dis-

cussion of "sudden and accidental" in pollution exclusion clauses in other decisions relevant to the meaning of the term in this policy.

defined by example in this particular policy, unambiguously includes a temporal component. To reiterate, whether under Texas or Illinois law, gradual corrosion, resulting in a pressure problem lasting more than a half-year before the well was eventually shut down and repaired, does not constitute a "sudden" event under the St. Paul policy rendering Walter Oil's property unusable until repaired.

St. Paul therefore did not breach its duty to defend Geo Pipe under the policy. St. Paul's first point of error is sustained. Because this point is dispositive, we do not consider St. Paul's remaining points.[5]

The summary judgment is reversed, and the cause is remanded to the trial court.

---

5. St. Paul's remaining points of error generally are premised on the choice of law governing the *effect* of the breach of a duty to defend. Illinois law, unlike that of Texas, estops an insurer from contesting indemnification coverage once the duty to defend has been breached. *Compare Thornton v. Paul,* 74 Ill.2d 132, 23 Ill.Dec. 541, 384 N.E.2d 335, 340 (1978) (observing that an insurer's wrongful failure to defend "estop[s] the insurer from later raising policy defenses or noncoverage in a subsequent action by the insured or by a judgment creditor in garnishment") *with Texas Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 602–03 (Tex.1988)

("The doctrine of estoppel cannot be used to create insurance coverage when none exists by the terms of the policy."). St. Paul argues alternatively that even if there was a duty to defend, (1) the trial court erred in applying Illinois law to the St. Paul policy; (2) Geo Pipe's assignment of its rights against St. Paul to Walter Oil was invalid under Texas law; and (3) there was insufficient proof of damages to support the trial court's award under Texas law. Because we have concluded St. Paul did not breach its duty to defend, we do not address whether the trial court should have applied Texas law to the remaining issues.