**BASIC ENERGY SERVICES, INC., Plaintiff**

v.

**LIBERTY MUTUAL INSURANCE CO., Defendant.**

No. MO–08–CV–78.

United States District Court, W.D. Texas, Midland–Odessa Division.

Sept. 18, 2009.

Lee H. Shidlofsky, Douglas P. Skelley, Visser Shidlofsky LLP, Austin, TX, for Plaintiff.

George B. Hall, Jr., Phelps Dunbar LLP, New Orleans, LA, Mary Cazes Greene, Phelps Dunbar, LLP, Houston, TX, for Defendant.

***ORDER (1) GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, and (3) GRANTING PLAINTIFF'S MOTION TO STRIKE SUMMARY JUDGMENT EVIDENCE***

ROBERT JUNELL, District Judge.

Before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. No. 30) and Defendant's Motion for Summary Judgment (Doc. No. 32, corrected 44), responses and supplemental responses to each, and Plaintiff's Opposed Motion to Strike Summary Judgment Evidence (Doc. No. 41). The Court held a pretrial hearing on July 28, 2009, at which it addressed the pending motions. The Court now **GRANTS** Plaintiff's Motion for Partial Summary Judgment, **GRANTS IN PART and DENIES IN PART** Defendant's Motion for Summary Judgment, and **DENIES** Plaintiff's Motion to Strike Summary Judgment Evidence.

## BACKGROUND

Basic Energy ("Plaintiff") purchased an Excess Commercial General Liability policy with Liberty Mutual Insurance Company ("Defendant"), effective August 1, 2007 to August 1, 2008, numbered EB1–641–005029–027. Basic Energy is an oil company based in Midland, Texas.

In September 2007, D–S–B Properties contracted with Plaintiff to replace an oil pump on a well (BM–Mosley # 1, or "the well"). Replacement began on September 12, 2007. While replacing the pump, Plaintiff discovered the tubing in the well might have a leak, and Plaintiff and D–S–B agreed to have Plaintiff conduct pressure tests on the tubing before returning it to the well. In the process of replacing the tubing and conducting the pressure tests, the tubing was dropped into the well, allegedly causing injury to the well bore and casing. As a result, D–S–B claimed the well was no longer able to produce oil. D–S–B risked losing its mineral lease on the property due to cessation of production. On November 5, 2007, D–S–B then sued Plaintiff in the 114th District Court of Smith County, Texas, in a case entitled *D–S–B Properties, Inc. v. Basic Energy Services,* Cause Number 07–2869–B, seeking damages for the cost to repair the well bore and reproduce (or re-drill) the well.

Several intervenors later also filed petitions in intervention in the state court case, on September 20, 2008. The intervenors sought damages for repair of the well, cost of reproduction of the well, market value of the well, lost income and royalties,

and cost of environmental damage to the well.

The case is before this court because Plaintiff is seeking to have its liability insurance carrier, Liberty Mutual ("Defendant"), pay the costs of Plaintiff's defense in the state court case, under the terms of its policy. Plaintiff alleges that it tendered the state court petition to Defendant and requested they pay defense costs on November 12, 2007. Defendant denied coverage (and declined to pay for the costs of defense) on February 13, 2008. Plaintiff requested a clarification of the coverage denial on February 18, 2008, and again on April 11, 2008, to no avail. Additionally, Plaintiff tendered Intervenors' Original and First Amended Petitions to Defendant on October 9, 2008, seeking defense. On November 12, 2008, Defendant again denied coverage for the underlying lawsuit.

Plaintiff then brought suit, based on diversity jurisdiction and adequate amount in controversy, alleging that it is entitled to attorney's fees as well as reimbursement. Plaintiff specifically seeks: (1) declaratory relief as to whether Defendant owes Plaintiff defense costs and expenses in the underlying lawsuit, (2) damages for breach of contract for Defendant's denial of coverage, (3) damages for violation of Art. 542.051 of the Texas Insurance Code, which requires prompt payment of claims and 18% penalty interest and attorney's fees for violations, and (4) attorney's fees.

In its answer, Defendant states: (1) Plaintiff's Original Complaint fails to state a cause of action upon which relief can be granted, (2) the policy language does not provide coverage to Plaintiff because no "occurrence" caused "property damage" or "loss of use" as those terms are defined in the policy and its exclusions, (3) Defendant's actions were not a producing cause of damages, injury, or loss suffered by Plaintiff, and (4) the policy does not pro-

vide a duty to defend because policy exclusions preclude coverage.

Defendant also counterclaims for declaratory judgment, seeking a judgment that it has no duty to defend or indemnify Plaintiff or pay any insurance proceeds under the policy. Further, under Texas Civil Practice and Remedies Code and 28 U.S.C. § 2202, Defendant also seeks recovery of its attorney's fees and costs.

## STANDARD OF REVIEW

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden to demonstrate the basis for the motion and the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir.1996). Only factual disputes that affect a suit's outcome to the extent that a reasonable jury could return a verdict for the non-moving party warrant granting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the movant carries this burden, the burden shifts to the nonmovant to show the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir.2001). Any inferences drawn from the underlying facts in dispute must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. If the record, viewed

in this manner, could not lead a rational trier of fact to find for the nonmovant, then summary judgment is proper. *Kelley v. Price–Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir.1993) (citing *Matsushita*, 475 U.S. at 577–78, 106 S.Ct. 1348). If, on the other hand, the factfinder could reasonably find in the nonmovant's favor, then summary judgment should be denied. *Id.* (citing *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505). Finally, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that it would be prudent to proceed to trial. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## DISCUSSION

The policy at issue is an excess commercial general liability insurance policy. It contains two main coverage grants, one for bodily injury and property damage liability, and one for personal and advertising injury liability. Regarding the property damage coverage, which is occurrence-based, the policy agrees to indemnify the insured for sums in excess of the "self-insured amount" for property damage to which the insurance applies. The insuring agreement states that "No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in Section VII—Supplementary Payments/ Allocated Loss Adjustment Expense." (Def. Mot. Summ. J. App. 69).

The parties' dispute, and the key issue in analyzing their competing claims for summary judgment, revolves around the analysis of Allocated Loss Adjustment Expense ("ALAE") in the insurance contract. This provision discusses a duty to reimburse under the insurance contract for certain legal expenses.

In major part, Plaintiffs allege that the duty to reimburse provision grants coverage for immediate payment by Defendant (after Plaintiff pays up to the self-insured amount) of Plaintiff's state court defense expenses and is not subject to any policy exclusions under the facts of this case. Defendant, to the contrary, claims that because the duty to defend is explicitly disclaimed in the insurance contract, Defendant is under no obligation to pay ALAE under the insurance agreement unless the payment is indemnification (paid after completion of the state court suit), and further, the factual situation of the underlying lawsuit falls under a policy exclusion that excludes payment entirely. The Court first analyzes the ALAE policy language, then examines whether this language triggers any duty to pay for Plaintiff's defense costs under Texas law. The Court finds that Defendant has an obligation to reimburse Plaintiff's defense costs and GRANTS Plaintiff's Motion for Partial Summary Judgment.

## I. *Allocated Loss Adjustment Expense ("ALAE") Policy Language*

Plaintiff seeks a ruling that Defendant is obligated to reimburse Plaintiff for "allocated loss adjustment expenses" incurred in defense of the state court lawsuit; Defendant seeks the opposite ruling. It is helpful, then, to establish exactly what policy language is being discussed.

Within the standard policy, Allocated Loss Adjustment Expense is initially discussed in Section VII, entitled "Supplementary Payments / Allocated Loss Adjustment Expense." (Def. Mot. Summ. J. App. 91). That section states, in pertinent part:

1.  Where the insured controls the defense, we [Defendant] will reimburse the insured [Plaintiff] for our proper share of the "allocated loss adjustment expense" paid by the insured for each "occurrence." Our proper share of the paid "allocated loss ad-

justment expense" shall be the ratio that the amount of damages paid under this Coverage Part for such "occurrence" bears to the sum of that amount plus the "self-insured amount." Our obligation to reimburse the insured is limited as set forth in the Section VI—Defense, Settlement and Investigation of Claims, paragraphs (5) and (6).

The definitions section of the policy, Section V, defines "allocated loss adjustment expense" as including, but not being limited to:

(a) reasonable attorneys' fees for claims in suit (reasonable attorneys' fees means rates which are actually paid by us to attorneys retained in the ordinary course of business in the defense of similar actions in the community where the claim is being defended);

(b) other costs and other items of expense such as:

(i) costs for medical, expert and other witnesses at trials or hearings, stenographic costs and costs of copies of documents and transcripts; and

(ii) medical, expert or consultant fees and expenses relating to the defense of any claim or "suit."

(c) up to $250 for cost of bail bonds required because of accident or traffic law violations arising out of the use of any Vehicle to which the Bodily Injury Liability Coverage applies, but we do not have to furnish these bonds.

(d) the cost of appeal bonds and bonds to release attachments within the applicable limit of insurance, but we do not have to furnish these bonds;

(e) all costs taxes against the insured in the "suit."

(Def. Mot. Summ. J. App. 84).

The language regarding ALAE payment, though, is changed via an endorsement to the policy. This endorsement, then, becomes the controlling language on Allocated Loss Adjustment Expense.[1]

SECTION [VII]—SUPPLEMENTARY PAYMENTS/ALLOCATED LOSS ADJUSTMENT EXPENSE is deleted and replaced with the following:

1. For each "occurrence", "Allocated Loss Adjustment Expense" paid by the insured will reduce the "Self–Insured Amount" applicable to that "occurrence".

2. Where the insured controls the defense, we will reimburse the insured for "Allocated Loss Adjustment Expense" incurred by the insured for any "occurrence" after the "Self–Insured Amount" has been exhausted by the payment of damages and/or "Allocated Loss Adjustment Expense" by the insured for that "occurrence". Our obligation to reimburse the insured is limited as set forth in the SECTION [VI]—Defense, Settlement and Investigation of Claims, paragraphs (5) and (6).

The First Named Insured shown in the Declarations shall maintain adequate records and supporting data for any reimbursement of "Allocated Loss Adjustment Expense" due from us. [. . .]

5. All expenses incurred by the insured or us in exercising the right to associate in the defense, investigation, and settlement of any claim or "suit" shall

---

1. The Court notes that the cross-reference numbering of the endorsement is improperly recorded. The parties both acknowledged this at the pretrial hearing, and here the Court substitutes the proper numbers, as agreed upon.

be incurred solely by the associating party.

6. In addition to our proper share of "Allocated Loss Adjustment Expense", we will pay:

(a) pre-judgment interest against the insured on that part of the judgment that is in excess of the "Self–Insured Amount" but not in excess of the applicable limit of insurance, but if we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer; and

(b) interest on that part of the judgment that is in excess of the "Self–Insured Amount" but not in excess of the applicable limit of insurance which accrues after entry of the judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is in excess of the "Self–Insured Amount" but within the applicable limit of insurance.

These payments will not reduce limits of insurance.

(Def. Mot. Summ. J. App. 25).

In reading the original Section VII, it is of note that the original policy language called for a "ratio" payment for ALAE. That mathematical ratio, presumably, could only be determined once the denominator was established in full, necessitating a single reimbursement payment once the entirety of the expenses were paid. The now-controlling endorsement language, however, lacks this distinction. Instead, it makes a blanket statement "we will reimburse the insured" for amounts incurred after the self-insured amount has been exhausted. The Court will take this into consideration as it analyzes the ALAE reimbursement obligation.

## II. *ALAE Reimbursement Characterization and Method of Review*

The parties, in their competing Motions for Summary Judgment, differ in their categorization of ALAE and how it should properly be analyzed. The Court notes at the outset that there is a paucity of case law discussing any duty to reimburse, which is essentially what the ALAE policy language creates. The parties, familiar with the state law duties to defend and to indemnify, attempt to analogize the policy language to existing Texas law.

Plaintiff argues that ALAE should be analyzed under an Eight Corners standard, similar to a duty to defend. Defendant argues that, because there is no duty to defend under the policy, the Eight Corners analysis is inapplicable and should be eschewed in favor of an analysis based on "actual facts," like a duty to indemnify.

■■■ "Under Texas law, the same general rules apply to the interpretation of contracts and insurance policies." *Aubris Res. L.P. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 483, 486 (5th Cir.2009). The insurance contract should be "considered as a whole" and "each part of the contract should be given effect." *Id.* (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994)). The primary concern of the court should be ascertaining the parties' true intent as expressed in the policy language; no construction should be adopted that renders a policy portion meaningless, useless, or inexplicable. *Id.* (citing *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex.2008)); *see also Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118 (Tex.1996) (holding that parties to contract intend every clause to have some effect). Additionally, the duty to defend and the duty to indemnify are separate under Texas law. *Nutmeg Ins. Co. v. Clear Lake City Water Authority*,

229 F.Supp.2d 668 (S.D.Tex.2002); *see also Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 821–22 (Tex.1997); *Saint Paul Surplus Lines Ins. Co. v. Geo Pipe Co.,* 25 S.W.3d 900, 903 (Tex.App.-Houston [1st Dist] 2000, remanded pursuant to settlement).

### A. *ALAE Reimbursement Provision is not a Duty to Defend*

■ The Court looks first to whether or not a duty to defend exists under the policy. As Plaintiff agreed at oral argument, the duty to defend is explicitly disclaimed in the insurance policy.[2] Under Texas law, the clear language of the policy can negate an insurer's duty to defend. *See Nat. Union Fire Ins. Co. of Pittsburgh v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997). The Court, like the parties, finds that the disclaimer alleviates Defendant of any duty to defend.

Defendant moved for summary judgment on this issue, and the Court GRANTS IN PART Defendant's Motion for Summary Judgment, only as to this single ground, and DENIES IN PART the rest of Defendant's Motion. However, simply because the ALAE reimbursement language cannot be construed as a strict duty to defend does not mean that the Court should not consider the reimbursement of defense costs provision of the ALAE under an Eight Corners-type analysis, traditionally used to analyze a duty to defend. It is to this issue that the Court next turns.

### B. *Eight Corners vs. "Actual Facts" Method of Review*

The main difference between using an Eight Corners analysis and an "Actual Facts" analysis consists in determining whether the obligation at hand applies to only *potentially* covered occurrences or whether the obligation only comes into play *after* liability has been determined to exist. The Court, guided by the parties' arguments and the contract language, finds that an obligation to reimburse an insured for incurred legal expenses should be analyzed using the Eight Corners Rule.

■ The Eight Corners analysis determines an insurer's duty to pay defense costs by examining only the third-party plaintiff's pleadings and the policy provisions, without regard to the truth or falsity of those allegations. *Argonaut Sw. Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex. 1973); *See Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.,* 387 S.W.2d 22, 24 (Tex.1965); *Maryland Cas. Co. v. Moritz,* 138 S.W.2d 1095 (Tex.Civ.App.-Austin 1940, writ ref'd). Then, Defendant owes an obligation to pay if any single allegation states a potential claim for coverage under the policy, taking all allegations as true. The Court agrees with Plaintiff that this reimbursement of defense costs obligation is most analogous to a duty to defend, even when the duty to defend is explicitly disclaimed.

To wait until the conclusion of the underlying state court lawsuit, as would be required if the Court were to use "actual facts," could potentially delay reimbursement or could completely nullify any such obligation if the insured were not adjudicated responsible for the underlying occurrence. The Court recalls that, under Texas law, it must ascertain the parties' true contractual intent as expressed in the policy language. Looking to the policy lan-

---

**2.** Specifically, the policy states "We will not have the duty to defend or investigate any claim or "suit" seeking damages to which this insurance may apply." (Def. Mot. Summ. J. App. 70). Plaintiff acknowledges this in its Response to Defendant's Supplemental Memorandum, page 1.

guage itself, there is no expressed intent to delay reimbursement of ALAE; rather, the endorsement contains a blanket statement that it will reimburse after the self-insured amount is reached.

The Court notes that reimbursement, by its definition, requires payment first by the insured. *See TIG Ins. Co. v. Eagle Inc.*, 294 Fed.Appx. 920, 923 (5th Cir.2008) (citing Louisiana district court for proposition that "reimbursement requires one to put forth something in order to be paid something back") (citation omitted). However, the Court finds no language in the policy requiring Plaintiff wait until after completion of the state court lawsuit before being reimbursed for its expenses. Thus, the Court applies the Eight Corners analysis to determine if Defendant has any obligation, as a matter of law, to begin immediately reimbursing Plaintiff once the self-insured amount is reached. *See also Liberty Mut. Ins. Co. v. Pella Corp.*, 631 F.Supp.2d 1125 (S.D.Iowa,2009) (interpreting an ALAE provision and stating "As set forth above, the Court holds that Liberty Mutual's duty to reimburse Pella's defense costs under the Policies is triggered once those costs are in excess of the 'Self-Insured Amount' set forth in the Declarations in any of the respective Policies, subject to the requirements under the Policies with respect to proof. . . .").

## III. *Examination of ALAE Reimbursement Obligation—Application of Eight Corners Rule*

After the proper analysis has been determined, the Court must see if, through application of that standard, the facts of this case trigger the reimbursement obligation. The plaintiff bears the initial burden of showing that a claim alleged in the underlying lawsuit is potentially within the scope of coverage of an insurance policy; the burden shifts to the defendant, then, to

prove an exception applies to bar coverage. *See Data Specialties, Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909, 911 (5th Cir.1997); *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex.2002). Ordinarily, in making this determination, no reference to facts outside the state court pleadings is made. *Nat'l Union Fire Ins. Co. v. Merch. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997).

Before delving into the coverage determination, there is an evidentiary issue the Court must consider. Defendant argues that if the Court uses an Eight Corners analysis to determine coverage, an exception exists that would allow consideration of affidavit evidence outside the pleadings to clarify the facts for a coverage determination. Plaintiff, in its Motion to Strike Summary Judgment Evidence, disagrees. The Court, GRANTING Plaintiff's Motion to Strike, first finds that no recognized exception exists that would allow consideration of information outside the pleadings and policy. Secondly, the Court, GRANTING Plaintiff's Motion for Partial Summary Judgment, applies the Eight Corners Rule and finds that coverage exists in this case.

### A. *No Exception to the Eight Corners Rule*

The Texas Supreme Court has never expressly recognized an exception to the Eight Corners rule, but it has recognized the use of outside evidence when relevant to an independent and discrete coverage issue, not touching on the merits of the underlying third-party claim. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex.2006).

Defendant relies upon a line of cases going back to *State Farm Fire & Cas. Co. v. Wade*, 827 S.W.2d 448 (Tex.Civ.App.-Corpus Christi 1992, writ denied), as precedent for recognizing an exception to the

eight-corners rule. (Def. Resp. To Pl. Mot. To Strike, 2) (stating "It is fair to say that the [Texas] Supreme Court has not embraced a broad exception, but it indeed has recognized a narrow exception by expressing what it is not prepared to permit."). However, the Fifth Circuit, in *Northfield Ins. Co. v. Loving Home Care, Inc.*, addressed the potential for any exception to the strict Eight Corners Rule and found that none exists. 363 F.3d 523, 529–530 (5th Cir.2004) (finding alternatively that "any exception would only apply in very limited circumstances: when it is initially impossible to discern whether coverage is potentially implicated and when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case.").

The Court excludes from its consideration extrinsic evidence in the four depositions provided by Defendant. The Court finds that this evidence seeks to use employee testimony to assert facts and opinions about the accident that is the subject of the underlying complaint in an effort to clarify whether the oil well involved in the underlying claim is unitary in nature. The Court finds that such a determination goes past the simple issue of coverage. As stated, the Court GRANTS Plaintiff's Motion to Strike Summary Judgment Evidence (Doc. No. 41). The Court will only look to the underlying pleadings and the policy itself when making a coverage determination.

## B. *Coverage Under Policy*

In deciding the ultimate coverage issue, the Court first looks to whether coverage possibly exists as alleged, then examines whether any exclusions apply to bar coverage. The parties disagree as to whether the business risk exclusions (j(5) and j(6)) in the policy pertain to the damage asserted in the state court lawsuit. The Court disagrees with Defendant and finds that coverage exists with no exceptions. The Court GRANTS Plaintiff's Motion for Partial Summary Judgment.

### 1. *Occurrence Triggering Coverage*

■ The policy, as stated above, is an excess commercial general liability policy. Under the policy language, Defendant contracted to indemnify Plaintiff for "sums in excess of the 'self-insured amount' that you have paid on behalf of any insured, which the insured was legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. (Def. Mot. Summ. J. App. 69). The "property damage" must be caused by an "occurrence" taking place in the "coverage territory," during the "policy period," and no person with authorization could have had prior knowledge of the property damage.[3] (Def. Mot. Summ. J. App. 69). As noted above, Defendant is also responsible under the agreement to reimburse Plaintiff for defense costs incurred "for any 'occurrence' " after Plaintiff exhausts its self-insured amount by payment of damages or ALAE. (Def. Mot. Summ. J. App. 24).

■ As defined in the policy, "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Def. Mot. Summ. J. App. 87). Occurrence is defined, in part, as an accident, but accident is not otherwise de-

---

3. The parties do not dispute that the incident in question occurred within the policy period, within the policy's coverage territory, and without any prior knowledge by any employee of the insured before the policy period. The main argument centers around whether the action was an "occurrence" under the policy.

fined in the policy. Terms that are not defined in a policy are given their generally accepted or commonly understood meaning. *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 7–8 (Tex.2007) (citing *W. Reserve Life Ins. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (Tex.1953)). "An accident is generally understood to be a fortuitous, unexpected, and unintended event." *Id.* at 8 (citations omitted). "But a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly." *Id.*

"Property damage", as defined in the policy, means

    a) physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b) loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Def. Mot. Summ. J. App. 88).

The Court now looks to the state court pleadings to determine whether physical injury to tangible property or loss of use of tangible property is alleged. The state court petition alleges that D–S–B's president authorized Plaintiff to conduct pressure testing on the tubing when placing it back into the well. (Orig. Petition, Def. Mot. Summ. J. App. 96). Further, "[w]hile performing the pressure test, [Basic Energy's] personnel failed to properly secure or handle the tubing as they placed it back

into the well. As a result, [Basic Energy] dropped the tubing string into the well, damag[ed] the well bore and apparently bust[ed] the casing such that drilling mud was detected in the well bore." (Orig. Petition; Def. Mot. Summ. J. App. 97).[4]

The Court finds that this language indicates the happening of an accident that resulted in physical injury to tangible property. Thus, the Court finds sufficient pleading that there is a potentially covered "occurrence" under the policy. Because the Plaintiff has met its burden to show an "occurrence" that could trigger coverage, the Court now looks to see if any policy exceptions apply to bar coverage.

### 2. *Policy Exceptions—"That Particular Part"*

▪ Defendant argues that policy exclusions j(5) and j(6)—containing language commonly known as "business risk exclusions"—apply to Plaintiff's claim and, therefore, no coverage will be provided. Exclusion j(5) excludes from coverage "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." (Def. Mot. Summ. J. App. 74). Exclusion j(6) excludes from coverage "[t]hat particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it." (Def. Mot. Summ. J. App. 74).

Plaintiff and Defendant diverge on their interpretation of "that particular part" in both exclusions. Plaintiff alleges that the "that particular part" language serves to exclude coverage from only the specific part of the property on which Plaintiff was

4.  The Intervenors' Amended Petition incorporates the facts as alleged in the underlying plaintiff's petition; therefore, the Court examines only the Plaintiff's (D–S–B's) Original Petition.

working; Plaintiff interprets this to be the well tubing only. Under Plaintiff's construction, the well is a collection of component parts and, therefore, the excess CGL policy should cover all damages except those to "that particular part" on which Plaintiff was working. Alternatively, Defendant argues "that particular part" means not only the tubing, but the entire well. In other words, because all the parts are necessary to the whole, the exclusion bars coverage for the whole well rather than just a component of it. Under Defendant's reading of the exclusion, the well is a singular unit and, therefore, Plaintiff would be barred from recovering any damages.

The Fifth Circuit recently answered the question of coverage involving "that particular part" in *Mid–Continent Casualty Company v. JHP Development, Incorporated.* While *Mid–Continent Casualty* was a case between a condominium builder and an insurance company, the question of application is identical to the one before the Court. *Mid–Continent Casualty* determined whether the j(6) exclusion barred recovery for: (A) damage to any part of a property on which the insured worked, regardless of whether the insured's work was defective or not on each of those parts, or (B) only that property damage which was the subject of the insured's defective work. *Mid–Continent Cas. Co. v. JHP Development, Inc.,* 557 F.3d 207, 215 (5th Cir.2009). The court held that "the plain meaning of the exclusion" is that damage only to parts of the property that were

themselves the subjects of the defective work are excluded. *Id.*

Also, in *Gore Design Completions, Limited v. Hartford Fire Insurance Company,* the Fifth Circuit ruled that the "[t]hat particular part" language is specific to damage on property that the insured actually worked on, and not the entire structure. *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.,* 538 F.3d 365, 371 (5th Cir.2008). In *Gore,* an in-flight entertainment system on an aircraft was mis-wired, damaging the aircraft's electrical system and electrical equipment and ultimately grounding the plane. *Id.* at 367 and 372. "*Gore* makes clear that the '[t]hat particular part' language of exclusion j(6) limits the scope of the exclusion to damage to parts of the property that were actually worked on by the insured." *Mid–Continent Cas. Co.,* 557 F.3d 207 at 214 (citing *Gore Design Completions, Ltd.,* 538 F.3d at 371).[5]

The Court notes that Texas law favors coverage when the insured's construction is not entirely unreasonable, even when the insurer's construction is perhaps more reasonable or a more accurate reflection of the parties' intent. *Id.* (citing *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663 at 666 (Tex.1987)). The Court finds that work done on the tubing and well bore is not equivalent to working on the entire well. The damage to the whole occurred due to faulty workmanship on a distinguishable component part. Basic Energy was working specifically on the tubing of the well; that their faulty workmanship caused damage to other parts of the well, rendering it

5. *But see Southwest Tank and Treater Manufacturing Company v. Mid–Continent Casualty Company,* 243 F.Supp.2d 597, 603 (E.D.Tex. 2003) (holding in favor of insurer that a steel storage tank on which the insured was working was "a self-contained, collective unit, which constituted a single item of property" when the insured was hired to install heating tubes to be used in the whole tank). The district court held that using the word "particular" in the j(5) and j(6) exclusion served only to create a distinction between damage to property worked on by the insured, and then damage to property that was not worked on by the insured. *Id.* at 603–04.

inoperable, was an unfortunate consequence, but it does not entail that Plaintiff was working on the entire well. The Court finds, under the facts involved, that no exception to coverage applies, under j(5) or j(6), and it is possible under the policy and the pleaded facts that: (1) damage occurred to real property outside of the work performed on the tubing, and (2) damage occurred to physical property other than the well tubing on which Plaintiff was working.

Because the pleadings and the policy language demonstrate an "occurrence" and no exclusion applies to bar coverage, the Court finds that the policy's preconditions for payment of ALAE are met under the endorsement. (Def. Mot. Summ. J. App. 24). As stated, Defendant and Plaintiff contracted to reimburse Plaintiff for ALAE incurred "for any 'occurrence'" after Plaintiff exhausts its self-insured amount by payment of damages or ALAE. The Court finds that Defendant has an obligation to reimburse Plaintiff for ALAE expenses incurred after Plaintiff demonstrates exhaustion of the self-insured amount and GRANTS Plaintiff's Motion for Partial Summary Judgment.

## IV. *Prompt Payment of Claims Act*

■ As the final issue for review, the Court determines whether Defendant is liable for damages under the Prompt Payment of Claims Act. The court finds that Liberty Mutual improperly denied Basic Energy's claim in the underlying lawsuit and is subject to pay the amount of the claims plus interest at a rate of 18% annually, plus reasonable attorney's fees. The Court GRANTS Plaintiff's Motion for Partial Summary Judgment on this issue.

■ The Prompt Payment of Claims Act ("PPCA") is to be liberally construed so as to promote its underlying purpose, which is to obtain prompt payment of claims. *See id.* § 542.054. The PPCA applies to insurance companies who provide commercial general liability insurance. *Lamar Homes, Inc. v. Mid–Continent Casualty Co.*, 242 S.W.3d 1, 20 (Tex.2007).

Generally, an insured triggers the PPCA by providing sufficient notice of a first-party claim to its insurer. *See* Tex. Ins. Code § 542.055(a). Under the PPCA, a "first party claim" made by an insured under an insurance policy must be paid by the insurer *directly to* the insured. Tex. Ins. Code § 542.051(2) (emphasis added). Texas courts have established that "duty to defend" claims are subject to PPCA and its penalties. *See Lamar Homes Inc.*, 242 S.W.3d 1. Duty to indemnify claims are also first-party claims subject to PPCA. *See, Med. Care Am. Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 425 (5th Cir. 2003); *See also Westcott Holdings, Inc. v. Monitor Liab. Managers, Inc.*, 2005 WL 2206196 *7–8 (S.D.Tex.2005) (finding insurer's duty to indemnify corporation is a first party claim because such benefits protect the insured from losses that have already been paid and the insurer's duty to pay runs directly to the insured party).

The applicability of PPCA hinges on whether the claim is a first-party claim paid directly to the insured. According to the policy at issue, the reimbursement claim does not pay to a third party, but rather "reimburses" the insured. Thus, this court finds that reimbursement of defense cost claims are first-party claims and GRANTS Plaintiff's Motion for Partial Summary Judgment as to this point.

PPCA penalties apply at the time an insurer improperly denies a first-party claim and, thus, fails to meet its obligations within PPCA's statutory deadline. *See* Tex. Ins. Code § 542.060(a); *see also Lamar Homes Inc.*, 242 S.W.3d at 16 (Tex. 2007) (an insurer who is liable under an insurance policy and who fails to promptly

respond to, or pay, the claim is liable for damages specified by PPCA); *see also, Watson v. Provident Life & Acc. Ins. Co.,* 2009 WL 1437823 *3 (N.D.Tex.2009); *see also, Trammell Crow Residential Co. v. Virginia Sur. Co., Inc.,* 643 F.Supp.2d 844 (N.D.Tex.2008). The Court notes that when an insured party seeks to invoke benefits under an insurance policy for defense costs associated with ongoing litigation, the insured party need not wait until the total amount of defense costs associated with the ongoing lawsuit is finalized before maturing rights under PPCA. *See Lamar Homes Inc.,* 242 S.W.3d at 19. Rather, the policy holder suffers an actual loss that is quantified after it retains counsel for the underlying suit and begins receiving statements or invoices for legal services.[6] *Lamar Homes Inc.,* 242 S.W.3d at 19. Accordingly, "attorney's fees cannot be awarded, and prejudgment interest does not begin accruing, until the insured actually incurs the defense costs." *Trammell Crow Residential Co.,* 643 F.Supp.2d at 859.

Since this court finds that the policy at issue is triggered by the allegations of the underlying lawsuit, reimbursement of defense costs is also triggered, as it is a benefit for "claims in suit" which are covered under the policy. According to Basic Energy's Motion for Partial Summary Judgment, Basic Energy tendered notice to Liberty Mutual of the Underlying Lawsuit, and the insurance claims thereon, on November 12, 2007. Liberty Mutual's response denying Basic Energy's claims was dated February 13, 2008. (Pl. Second Am. Compl., 3). Unless Liberty Mutual acknowledged Basic Energy's notice of claim within 15 days or less, well before the February 13, 2008 letter, Liberty Mutual

violated PPCA by not complying with "Receipt of Notice of Claim" (Tex. Ins. Code § 542.055) within the statutory deadline. It is logical to conclude that Liberty Mutual found the information submitted to it on November 12, 2007 sufficient to secure "final proof of loss," since Liberty Mutual denied the claim contained therein as not covered under the policy. Thus, the Court finds that the date that Defendant improperly denied Plaintiff's first claim was February 13, 2008.[7]

### CONCLUSION

Based on the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment (Doc. No. 30), **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment (Doc. No. 32, corrected 44), and **GRANTS** Plaintiff's Opposed Motion to Strike Summary Judgment Evidence (Doc. No. 41).

**IT IS SO ORDERED.**

---

**6.** These invoices become the "final proof of loss" as required by PPCA. *Id.,* Tex. Ins. Code § 542.056(a).

**7.** The court requires further evidence of Basic Energy's defense invoices or statements in order to determine precise damages and from what date interest may apply.