David Alan Ezra, Senior United States Distict Judge
The matters before the Court are (1) Plaintiff CBX Resources, LLC's ("CBX")
*952 Motion for Partial Summary Judgment (Dkt. # 16), (2) Defendants Ace American Insurance Company ("Ace American") and Ace Property and Casualty Insurance Company's ("Ace Property") (collectively, "Defendants" or "Ace") Motion for Partial Summary Judgment on Ace's Duty to Defend (Dkt. # 17); and (3) CBX's Objections to and Motion to Strike Evidence in Support of Defendants Motion for Partial Summary Judgment (Dkt. # 22).
On October 12, 2017, the Court held a hearing on these matters. CBX was represented by Mark Fassold; Defendants were represented by Manuel Mungia and Daniel Lane. After careful consideration of the memoranda in support of and in opposition to the motions, and in light of the parties' arguments at the hearing, the Court, for the reasons that follow, GRANTS Ace's motion for partial summary judgment, DENIES CBX's motion for partial summary judgment, and OVERRULES CBX's objections and motion to strike evidence.
FACTUAL BACKGROUND
CBX was the lessee of the Hibdon Lease, a mineral tract located in Zavala County, Texas. (Dkt. # 16 at 7.) As lessee, CBX arranged for the drilling and operation of the Picosa Creek 1V Well ("the Well") to be performed by Espada Operating, LLC ("Espada"). (Id. ) In 2011, Espada drilled the well bore, placing almost 900 feet of surface casing and more than 5,700 feet of production casing into the Well, and installed a fracking system into the production casing. (Id. ) On October 25, 2011, Espada attempted to pressurize the fracking system; a few months later, on January 25, 2012, Espada attempted to pull the production casing out of the well bore. (Id. ) In pulling out the production casing, Espada discovered a fracture of about 3,400 feet in the Well. (Id. ) Espada determined that the production casing below the fracture could not be recovered from the well bore. (Id. ) Because the casing was irremovable, the well bore could not be restored, resulting in the plugging and abandonment of the Well. (Id. )
Espada was a named insured on a Commercial General Liability ("CGL Policy") issued by Ace American, with a coverage period from April 2, 2011, through April 2, 2012. (Dkt. # 16 at 7.) The CGL Policy was accompanied by an "Underground Resources and Equipment Coverage Endorsement," which replaced and/or added exclusions in the CGL Policy, while adding certain definitions to the CGL Policy. (Id. ) Espada was also a named insured on an Umbrella Policy issued by Ace Property, which covered the same policy period of April 2, 2011, through April 2, 2012. (Id. )
PROCEDURAL BACKGROUND-STATE COURT CASE
On February 21, 2013, CBX brought suit for damages arising from its total loss of the use of the Well against several defendants-but not Espada-in the 293rd Judicial District Court of Zavala County, Texas ("underlying case"). (Dkt. # 16 at Ex. C.) In October 2013, CBX amended its state court petition, adding Espada as a defendant, and appending a Certificate of Merit of a licensed engineer who described Espada's role in the failure of the Well. (Id. at Ex. D.) According to CBX, Espada filed its original answer on November 19, 2013, represented by counsel retained by Ace American after Espada tendered the defense of the lawsuit to Ace.[1] (Id. at Exs. E, L.) The state court set a trial in this case for February 9, 2016. (Id. at Ex. F.)
*953 On August 7, 2015, CBX filed its second amended petition, itemizing alleged damages to its tangible property including: drilling operations, surface casing, unrecovered production casing, the Well and the well bore, the oil and gas itself, and the lease. (Dkt. # 16 at Ex. G.) On August 13, 2015, Espada filed a third party petition, suing three separate parties. (Id. at Ex. H.) Espada's third party petition stated that it "alleges that a catastrophic failure of the casing occurred down hole in the Well," and that the "Well allegedly could not be repaired and was plugged and abandoned." (Id. )
On September 22, 2015, CBX served a Stowers demand upon Espada through its counsel, seeking to fully and unconditionally release its claims for an amount within the limits of the policies issued to Espada by Ace American and Ace Property. (Dkt. # 16 at Ex. I.) By its terms, the Stowers demand was set to expire on October 23, 2015, at 5:00pm. (Id. )
However, on October 15, 2017, the Claims Director for Ace American, Matthew Spector, sent a withdrawal letter to Espada. (Id. at Ex. K.) The letter indicated that Ace American intended "to cease the retention of defense counsel effective fourteen days from that date of [the] letter," or, on October 29, 2015. (Id. ) Mr. Spector's letter characterized CBX's claims as non-professional liability negligence claims. (Id. ) On November 30, 2015, approximately 71 days before the February 9, 2016 trial setting, the state court granted Espada's defense counsel's motion to withdraw as counsel. (Id. at Exs. L, M.)
A pre-trial hearing was held in the state court case on February 1, 2016; Espada failed to appear at the hearing. (Dkt. # 16 at Ex. N.) Because of Espada's failure to appear at the hearing, CBX requested the state court enter judgment in CBX's favor against Espada.[2] (Id. ) The Court ordered that judgment be entered in CBX's favor and set the matter for February 10, 2016, to hear evidence in support of damages. (Id. ) On February 10, 2016, the state court heard evidence from CBX's witnesses and exhibits in support of its claim. (Id. at Ex. O.) The state court entered judgment, finding that Espada was negligent and awarded damages and post-judgment interest payable to CBX by Espada. (Id. at Ex. N.) According to CBX, the judgment became final and is no longer appealable. (Dkt. # 16 at 10.)
On November 1, 2016, the state court entered an Order for Turnover Relief ("turnover order"), transferring ownership of Espada's causes of action against Ace American and Ace Property to CBX.[3] (Dkt. # 16 at Ex. P.) The turnover order also compelled Espada to execute an assignment of those claims to CBX; according to CBX, Espada has complied with that portion of the turnover order. (See id. at 11; Ex. P.)
PROCEDURAL BACKGROUND-FEDERAL COURT CASE
On January 10, 2017, CBX filed suit in this Court against Ace American and Ace Property. (Dkt. # 1.) Its first amended complaint alleges claims against Defendants for (1) breach of the Stowers duty to reasonably settle claims within the scope of coverage and for an amount within the limits of the applicable policy; (2) bad faith; (3) breach of contract; (4) deceptive insurance practices; and (5) declaratory judgment regarding Defendants' duties to *954 defend and indemnify Espada in the underlying case. (Dkt. # 33.)
Pursuant to the Court's scheduling order entered in this case on April 13, 2017, the parties were allowed to file partial motions for summary judgment regarding Ace's duty to defend the underlying case based on the terms and conditions of the CGL Policy and the Umbrella Policy. (Dkt. # 14.) In accordance with that Order, CBX filed the instant motion for partial summary judgment on May 19, 2017. (Dkt. # 16.) Ace filed its own motion for partial summary judgment on the same day. (Dkt. # 17.) Both parties filed responses in opposition to the respective motions on June 16, 2017. (Dkts. ## 20, 21.) The parties filed replies on June 30, 2017. (Dkts. ## 27, 29.) On June 16, 2017, CBX filed an objection to, and a motion to strike, evidence in support of Ace's motion for partial summary judgment. (Dkt. # 22.) Ace filed a response in opposition on June 30, 2017. (Dkt. # 28.) The pending motions are addressed below.
APPLICABLE LAW
A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact," and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) ; see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014). A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000) ). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ).
In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ). At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. See Fed. R. Civ. P. 56(c) ; Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003) ).
ANALYSIS
CBX argues in its motion that as (1) the owner of Espada's causes of action against Ace by the turnover order, (2) the assignee of Espada's causes of action against Ace, and (3) the judgment creditor by right under the CGL Policy, it is entitled to partial summary judgment declaring that Ace American had a duty to defend Espada pursuant to the CGL Policy, and Ace *955 Property had a duty to defend Espada pursuant to the Umbrella Policy, through trial of the underlying case. (Dkt. # 16.) Ace's motion for partial summary judgment asserts that neither Ace American nor Ace Property had any duty to defend Espada in the underlying case for either the CGL Policy or the Umbrella Policy. (Dkt. # 17.) Because both CBX and Ace's motions for partial summary judgment concern the same issue, the Court will consider them together. (See Dkts. ## 16, 17.)
A. Texas Law
The Court must "apply Texas law as interpreted by Texas state courts." Gilbane Bldg. Co. v. Admiral Ins. Co., 664 F.3d 589, 593 (5th Cir. 2011) (quoting Mid-Continent Cas. Co. v. Swift Energy Co., 206 F.3d 487, 491 (5th Cir. 2000) ). Under Texas law, "insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine." Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC, 620 F.3d 558, 562 (5th Cir. 2010). The Court must interpret the contract to discern the intention of the parties as it is expressed in the policy. Id. Whether a contract is ambiguous is also a question of law. Id. (citing Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998) ). An ambiguity is not present simply because the parties advance conflicting interpretations, but exists "only if the contractual language is susceptible to two or more reasonable interpretations." Id. (citing Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003) ).
"Under Texas law, an insurer may have two responsibilities relating to coverage-the duty to defend and the duty to indemnify." Gilbane, 664 F.3d at 594 (citing D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co., 300 S.W.3d 740, 743 (Tex. 2009) ). An insurer's duty to defend is determined by the application of the eight-corners rule. GuideOne Elite Ins. Co. v. Fielder Road Baptist Church, 197 S.W.3d 305, 308 (Tex. 2006). "The rule takes its name from the fact that only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the third-party claimant." Id. (citing King v. Dall. Fire Ins. Co., 85 S.W.3d 185, 187 (Tex. 2002) ). All doubts regarding the duty to defend are resolved in favor of the duty, and the pleadings are construed liberally. Zurich Am. Ins. Co. v. Nokia, Inc., 268 S.W.3d 487, 491 (Tex. 2008). "If a complaint potentially includes a covered claim, the insurer must defend the entire suit." Id. (citation omitted).
Under Texas law, the insured has the burden to prove that coverage exists. Wallis v. United Servs. Auto. Ass'n, 2 S.W.3d 300, 303 (Tex.App.-San Antonio 1999, pet. denied). The insurer must establish that one or more policy exclusions apply. Federated Mut. Ins. Co. v. Grapevine Excavation, Inc., 197 F.3d 720, 723 (5th Cir. 1999). Once the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion. Id. The parties may satisfy their respective burdens by pointing to evidence in the record that creates a genuine issue of material fact for trial. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).
B. Whether Ace American Had a Duty to Defend Under the CGL Policy
Ace American contends that it had no duty defend Espada under the CGL Policy because the exclusion in paragraph J(5) bars coverage for CBX's underlying claims against Espada. (Dkt. # 17 at 12.) Ace *956 American also argues that the CGL Policy's Professional Services Exclusion bars any coverage for the underlying case. (Id. at 19.)
1. Ace American's CGL Policy Provisions
In relevant part, the CGL Policy provides as follows:
SECTION I-COVERAGES
COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages....
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
(2) The "bodily injury" or "property damage" occurs during the policy period.
(Dkt. # 8-1 at 4.)
"Property Damage" is defined by the CGL Policy to mean:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
(Id. at 18.) An "occurrence" is defined by the policies to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 17.)
The coverage provided under the Insuring Agreement also contains various exclusions. Specifically, the CGL Policies provide:
2. Exclusions
This insurance does not apply to: ...
j. Damage To Property
"Property damage" to: ...
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; ...
(Dkt. # 8-1 at 7.)
The CGL Policy was also accompanied by an "Exclusion-Engineers, Architects or Surveyors Professional Liability" ("Professional Services Exclusion"), as well an "Underground Resources and Equipment Coverage Endorsement" ("UREC Endorsement"). (Dkt. # 8-1 at 39, 53.) The Professional Services Exclusion provides, in relevant part, that coverage is precluded for "property damage ... arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity." (Id. at 39.)
The UREC Endorsement addresses " 'property damage' included within the 'underground resources hazard' or the 'underground equipment hazard' and arising out of the operations performed by [the Named Insured] or on [the Named Insured's] behalf." (Id. at 53.) " 'Underground *957 resources hazard' includes 'property damage' to ... [o]il, gas, water or other mineral substances which have not been reduced to physical possession above the surface of the earth or above the surface of any body of water," and "[a]ny well, hole, formation, strata or area in or through which exploration for or production of any substance is carried on." (Id. at 54.) " 'Underground equipment hazard' includes 'property damage' to any casing, pipe, bit, tool, pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well or hole or beneath the surface of any body of water." (Id. )
2. Exclusions to the CGL Policy
There is no dispute by Ace that CBX experienced "property damage" caused by an "occurrence," as defined in the CGL Policy, as a result of Espada's work on the Well. (See Dkt. # 20 at 5-6.) Instead, Ace argues that the CGL Policy contains two exclusions that trump CBX's claims against Ace American. (Dkt. # 20 at 6, 8; Dkt. # 17 at 17, 24.) In support of its summary judgment motion, Ace contends that the "damage to property" exclusion and the "Professional Services Exclusion" exclude coverage for property damage as a result of Espada's defective work. (Dkt. # 20 at 6, 8; Dkt. # 17 at 17, 24.)
a. "Damage to Property" Exclusion
Paragraph j(5) states that Ace American will not cover "property damage to ... "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations." (Dkt. # 8-1 at 7.) Construing the plain meaning of provision j(5), Texas courts have determined that "the use of the present tense indicates that the exclusion applies to circumstances where the contractor or subcontractors are currently working on the project." CU Lloyd's of Tex. v. Main St. Homes, Inc., 79 S.W.3d 687, 696 (Tex. App.-Austin 2002, no pet.) (emphasis in original); see also Mid-Continent Cas. Co. v. JHP Dev., Inc., 557 F.3d 207 (5th Cir. 2009).
The parties do not appear to dispute that the alleged property damage to the Well occurred during Espada's performance of the construction operations. (See Dkt. # 17 at 18; Dkt. # 21 at 11.) Instead, the dispute is whether paragraph j(5) excludes coverage only for damage to the production casing and/or the completion liner of the Well, but not physical injury to, and loss of use of, the Well in its entirety. (See Dkt. # 17 at 18; Dkt. # 21 at 11.) To answer this question, the Court must consider the parties' opposing definitions of "that particular part" as stated in the exclusion. See Basic Energy Servs., Inc. v. Liberty Mut. Ins. Co., 655 F.Supp.2d 666, 676-77 (W.D. Tex. Sept. 18, 2009), vacated, (Jan. 21, 2010) (considering the definition of "that particular part" in deciding whether CGL Policy's exclusions in paragraphs j(5) and j(6) excluded coverage).
CBX alleges that the "that particular part" language serves to exclude coverage from only the specific part of the property on which Espada was working; CBX interprets this to be the production casing and/or the completion liner of the Well. (Dkt. # 21 at 11.) In support, CBX argues that its second amended petition in the underlying case clearly alleges damage to property that occurred only during Espada's performance of operations on the production casing of the Well and/or the completion liner of the Well. (Id.; Dkt. # 21-8.) CBX contends that, even if paragraph j(5) excludes damage to the production casing and/or the completion liner of the Well, it does not exclude damage to the remaining components of the Well. (Dkt.
*958 # 21 at 11.) CBX argues that it has alleged other damage not within this scope of this exclusion, including damage to tangible property that is still covered by Ace American's CGL Policy, including (1) drilling operations, (2) surface casing, (3) unrecovered production casing, (4) the well and the wellbore, (5) the oil and gas itself, and (6) the lease. (Dkt. # 16 at 8.)
Ace American, on the other hand, argues "that particular part" means not only the production casing and/or the completion liner, but the entire well. (Dkt. # 29 at 6.) In other words, because all the parts are necessary to the whole, the exclusion bars coverage for the whole well rather than just a component of it. Under this reading of the exclusion, the Well is a singular unit and, therefore, CBX would be barred from recovering any damages. Ace American contends that Espada was not hired to work on a discrete component of an already completed well, but was instead hired to drill, operate, and construct the entire well, and in the course of its operations, Espada damaged the entire well. (Id. at 5-6.)
In support of its position, CBX cites cases where parties were contracted to perform work on discrete components of previously completed projects, such as wells, but not to oversee and construct the entire project. See, e.g., Basic Energy, 655 F.Supp.2d at 668 (refusing to apply same exclusion on basis that insured was hired only to replace an oil pump and tubing on a previously constructed well); Underwriters at Lloyd's London v. OSCA, Inc., 2006 WL 941794, at *18-19 (5th Cir. 2006) (per curiam) (unpublished) (interpreting Louisiana law); Gore Design Completions, Ltd. v. Hartford Fire Ins. Co., 538 F.3d 365, 371-72 (5th Cir. 2008) (holding that when the insured was hired for "engineering of an in-flight entertainment/cabin management system," exclusion only "exclude[d] coverage for the damage to the IFE/CMS itself (or, perhaps, the electrical system) but not the rest of the Aircraft and the ensuing loss of use damages"). However, these cases are inapposite to the facts in this case. Unlike these cases, Espada was contracted to perform work during, and to oversee, construction of the entire well-not just the production casing and completion liner within an already completed well.
The Fifth Circuit has noted that "casing is not a component of a well that functions independently, and without which the rest of the well could continue to function." Cook v. Admiral Ins. Co., 438 Fed.Appx. 313, 318 (5th Cir. 2011) (quotation marks omitted) (considering CGL Policy exclusion precluding coverage for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it"). Therefore, by damaging the casing and/or the liner of the Well, Espada "caused defects in the construction of the well as a whole." See id. at 318-19 (quotation marks omitted). "These circumstances are distinguishable from those of defective repair work (performed after a well is constructed) that causes damage only to the casing, a pre-installed component of the finished well." Id. at 319 (citing OSCA, Inc., 2006 WL 941794, at *18-19 ). The Fifth Circuit distinguished cases "in which the insured's work was to be performed on a discrete independent component of a whole piece of property, and its defective work on that one component caused damage to other components of the whole property." Id. at 318 n.20 (citing Gore, 538 F.3d at 371-72 ).
"By contrast, here there was no domino effect of damage to the entire well triggered by [Espada's] defective work on one independent working part of the well; rather, [Espada's] work was performed during the overall drilling and completion operation of the [W]ell and thus caused *959 damage to the entire [W]ell when [its] work was incorrectly performed." See id.; cf. Mid-Continent Cas. Co. v. Krolczyk, 408 S.W.3d 896, 905 (Tex. App.-Hous. [1st Dist.] 2013, pet. denied) (refusing to apply exclusion to whole of a large road construction project due to its unique aspects and components).
Indeed, CBX's pleadings in its state court second amended petition support such a conclusion. CBX alleges that: (1) Espada was hired to drill and operate the Hibdon lease; (2) Espada and/or its subcontractors drilled the Well's well bore; (3) Espada and/or its subcontractors placed over 5,000 feet of production casing and a fracking completion system into the Well; (4) Espada and/or its subcontractors attempted to pressurize the completion system; (5) the production casing was fractured at about 3,400 feet; and, as a result of the fractured casing; (6) the Well was plugged and abandoned. (Dkt. # 21-8 at 3-4.)
Accordingly, the Court finds that the property damage alleged by CBX, including the physical injury to, and loss of use of, the Well falls within the "property damage" exclusion in paragraph j(5) and is excluded from coverage under the CGL Policy unless, as CBX contends, the UREC Endorsement supersedes this exclusion.[4]
b. UREC Endorsement
CBX contends that, even if paragraph j(5) excludes coverage for property damage to property other than the Well's production casing or completion liner, the exclusion is superseded by the UREC Endorsement to the CGL Policy. (Dkt. # 21 at 14.) Ace American, on the other hand, argues that the UREC Endorsement does not conflict with paragraph j(5)'s exclusion. (Dkt. # 17 at 20.) Ace American contends that the UREC Endorsement only (1) modifies and replaces a single exclusion contained in paragraph j(4) of the CGL Policy, and (2) reduces the aggregate limits of liability applicable to claims arising out of certain types of property damage. (Id. )
Endorsements to a policy are issued to add coverages that would otherwise be excluded. Mesa Operating Co. v. Cal. Union Ins. Co., 986 S.W.2d 749, 754 (Tex. App.-Dallas 1999, pet. denied). When an endorsement provides an express grant of coverage, the endorsement supersedes any exclusions in the main body of the policy to the contrary. Id.; Westchester Fire Ins. v. Heddington Ins. Ltd., 883 F.Supp. 158, 165 (S.D. Tex. 1995), aff'd, 84 F.3d 432 (5th Cir. 1996). In particular, a UREC Endorsement providing coverage to the assured will supersede exclusions in the pre-printed policy form to the contrary. Investors Ins. Co. of Am. v. Breck Operating Corp., No. Civ.A 1:02-CV-122-C, 2003 WL 21056849, at *13 (N.D. Tex. May 8, 2003) (underground resources and equipment coverage endorsement superseded the policy's form pollution exclusion).
*960 The UREC Endorsement at issue here expressly changes the CGL Policy in three main ways. First, it reduces the aggregate limits of liability applicable to claims arising out of certain property damage from $2,000,000 to $1,000,000. (Dkt. # 8-1 at 53-54.) Second, the UREC Endorsement expressly replaces part of the language of the exclusion contained within paragraph j(4) in the CGL Policy. (Id. at 54.) As a result, paragraph j(4), stating that "property damage" to the "[p]ersonal property in the care, custody or control of the insured" will be excluded from coverage, narrows that exclusion and now includes language that "[t]his exclusion does not apply to any 'property damage' included within the 'underground resources hazard' or the 'underground equipment hazard' other than 'property damage' to that particular part of any real property on which operations are being performed by you or on your behalf if the 'property damage' arises out of those operations." (Id. ) Last, the UREC Endorsement defines "Underground resources hazard" and "Underground equipment hazard." (Id. ) The UREC Endorsement expressly provides that "[a]ll other terms and conditions of the policy remain unchanged." (Id. )
In support of its interpretation of the UREC Endorsement, CBX cites Mid-Continent Cas. Co. v. Bay Rock Operating Co., 614 F.3d 105 (5th Circuit 2010), in which the Fifth Circuit affirmed the district court's conclusion that an Oil & Gas Endorsement superseded the exclusions contained in paragraphs j(5) and j(6) in the insured's CGL Policy-identical in wording to the CGL Policy exclusions in this case. The insured in that case, Bay Rock, was responsible for the supervision of a well that experienced a blow-out caused by a sub-contractor. Id. The district court found that the Oil & Gas Endorsement superseded the CGL policy exclusions in paragraphs j(5) and j(6) in that case, and that Mid-Continent had a duty to defend Bay Rock in an underlying suit for damages. Mid-Continent Cas. Co. v. Bay Rock Operating Co., 2009 WL 5341825, at *7 (W.D. Tex. Sept. 30, 2009).
The Court here, however, finds Bay Rock distinguishable from the facts in this case. The Oil & Gas Endorsement in Bay Rock did not contain wording specifically identifying any express exclusion(s) in the CGL Policy to which it applied or superseded. Id. at *5. Instead, the district court determined that "a potential conflict with the coverage grant in the Oil & Gas Endorsement existed" because the endorsement "purport[ed] to exclude coverage for damage to that particular part of property that the insured was working on." Id. The Fifth Circuit, in affirming the district court, noted that "[t]he Oil & Gas Endorsement provided Bay Rock with additional coverage for property damage to the" underground resources hazard. Bay Rock, 614 F.3d at 115. Indeed, the Oil & Gas Endorsement considered in that case specifically states that "the 'Underground Resources Hazard' is included within the Limit of Insurance."[5] (Dkt. # 17-3 at 87.) Here, however, there is no similar language in the UREC Endorsement specifically providing coverage for either the underground resources hazard or the underground equipment hazard. Instead, the UREC Endorsement *961 clearly and explicitly adds coverage only to the exclusion in paragraph j(4), while indicating that "[a]ll other terms and conditions of the policy remain unchanged"-no such similar language appears in Bay Rock's Oil & Gas Endorsement. (Dkt. # 8-1 at 54; Dkt. # 17-3 at 87-89.)
Therefore, contrary to CBX's contention, the Court finds the language in the UREC Endorsement unambiguous and that its language does not conflict with the exclusion in paragraph j(5). As discussed, the UREC Endorsement clearly and explicitly states that it is replacing only paragraph j(4)'s exclusion, stated above, with language that expands Espada's coverage for damage to property that occurs in the area defined as the "underground resources hazard"[6] and the "underground equipment hazard."[7] (Dkt. # 8-1 at 54.) Nowhere in the UREC Endorsement does it purport to modify, change, add, or delete the exclusion for damage to real property addressed in paragraph j(5). (See itation case-ids="3706397" index="63" url="https://cite.case.law/f3d/614/105/">id. )
"A consideration of the rules and principles of contract law further supports a conclusion that the UREC Endorsement does not conflict with and supersede the" exclusion in paragraph j(5). Liberty Mut. Ins. Co. v. Linn Energy LLC, 2013 WL 12141366, at *7 (S.D. Tex. Sept. 5, 3013) (citing Progressive Cnty. Mut. Ins. Co. v. Sink, 107 S.W.3d 547, 551 (Tex. 2003) ("It is well settled that the general rules of contract construction apply to the interpretation of insurance contracts."). It is true that exceptions and limitations to insurance policies are strictly construed against the insurer. Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc., 542 F.3d 106, 112 (5th Cir. 2008). However, "each part of the [insurance] contract must also be given effect and meaning." Id."An interpretation that gives a reasonable meaning to all provisions is preferable to one that leaves a portion of the policy useless, inexplicable, or creates surplusage." Id. at 112-13. Thus, the interpretation proposed by Ace American allows the UREC Endorsement and the CGL Policy to be read together, giving both effect and meaning.
Moreover, in consideration of the rule that courts should "give effect to the written expression of the parties' intent ... [and should] examine [ ] the entire policy to determine the true intent of the parties," Indian Harbor Ins. Co. v. KB Lone Star, Inc., No. H-11-CV-1846, 2012 WL 3866858, at *4 (S.D. Tex. Sept. 5, 2012), the Court observes that the UREC Endorsement does not specifically alter, amend, or *962 add any other coverage in the CGL Policy, aside from the exclusion in paragraph j(4)-which it explicitly and squarely purports to replace. For these reasons, the Court concludes that the UREC Endorsement and the exclusion in paragraph j(5) do not conflict, and thus the UREC Endorsement does not supersede the exclusion in paragraph j(5). Accordingly, despite CBX's argument to the contrary, Ace American had no duty to defend Espada in the underlying case on this basis.
c. Professional Services Exclusion
Ace American further argues that the Professional Services Exclusion, defined above, also precludes coverage for Espada's property damage to the Well. (Dkt. # 17 at 24.) Ace American asserts that the underlying case is based on Espada's failure to use its specialized or technical knowledge in its work on drilling and operating the Well. (Id. ) In opposition, CBX disputes that Espada's work on the Well qualifies as "professional services." (Dkt. # 21 at 18.) Although the Court has already found that the property damage to the Well was excluded from coverage pursuant to the CGL Policy, to be thorough, the Court will consider the Professional Services Exclusion, as well.
Since the CGL Policy does not define professional services, the relevant definition is that provided by Texas law: "the task must arise out of acts particular to the individual's specialized vocation, [and] ... it must be necessary for the professional to use his specialized knowledge or training." Atl. Lloyd's Ins. Co. of Tex. v. Susman Godfrey, L.L.P., 982 S.W.2d 472, 476-77 (Tex. App.-Dallas 1998, pet. denied). While it does not define professional services, the CGL Policy does include a list of activities that fall within the exclusion, including: "supervisory, inspection, architectural or engineering activities." (Dkt. # 8-1 at 39.) None of these terms are further defined.
In accordance with the eight-corners rule, the Court will look to the state court petition in the underlying case to determine whether the conduct alleged falls within the Professional Services Exclusion. See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc., 939 S.W.2d 139, 141 (Tex. 1997). CBX's second amended petition alleges that "Espada was retained for the purpose of implementing [another's] plan, procuring and using the proper materials to include casing, and performing related oil and gas well drilling and completion services to deliver a producing well for [CBX]." (Dkt. # 21-8 at 7.) CBX further alleges that "Espada owed a duty to perform these activities within recognized industry standards and practices, as well as to deliver a competent well design that would result in a completed and productive well." (Id. ) CBX alleges that Espada's breach of this duty resulted in "deviations from accepted industry practices and standards constitute[ing] professional negligence." (Id. ) In support of its negligence claim, CBX attached to the petition, an affidavit from a licensed engineer who opined that Espada was professionally negligent in its actions, stating that Espada's "acts, errors, and/or omissions renders the professional services provided insufficient and inadequate." (See Dkt. # 21-5 at 12-16.)
Here, while CBX acknowledges that some of its allegations against Espada are for professional negligence, it asserts that it also alleged ordinary negligence against Espada for the "mundane tasks of drilling and operating." (Dkt. # 27 at 19.) For instance, CBX contends that its live state court petition "leaves open the possibility that the negligent [acts] resulted from ordinary negligence-e.g., a worker fell asleep during [the] operation, dropped a tool that damaged equipment, etc." (Dkt.
*963 # 27 at 13.) CBX also argues that, in any case, the UREC Endorsement, discussed above, supersedes the Professional Liability Exclusion. (Id. at 14.)
First, the Court finds CBX's argument that the UREC Endorsement supersedes the Professional Services Exclusion meritless. The Court has already determined, as discussed above, that the UREC Endorsement does not supersede any of the real property damage to the Well at issue. Additionally, to the extent an endorsement can conflict with an added exclusion not contained within the main body of a CGL Policy,[8] the Court finds that the UREC Endorsement and the Professional Services Exclusion do not conflict with each other, and therefore, the UREC Endorsement does not supersede the Professional Services Exclusion.
Second, the Court finds that CBX's argument that its petition alleges claims based on non-professional services also fails. CBX has clearly alleged that its claims are based on Espada's failure "to deliver a producing well for [CBX]," and they are grounded on Espada's "professional negligence," stemming from the "deviations of accepted industry practices and standards." (Dkt. # 21-8 at 7.) CBX further alleges that "Espada owed a duty to perform these services within recognized industry standards." (Id. ) CBX's allegations do not otherwise clearly allocate some of the breach of duty to any non-professional duties, and its attached affidavit of an engineer in support of its claims for professional negligence does not do so either.
The Court also finds that CBX's request for the Court to consider that perhaps "a worker fell asleep during [the] operation, [or] dropped a tool that damaged equipment," asks the Court to look beyond the eight-corners of the petition and CGL Policy. CBX has not alleged these ordinary negligence facts in its state court petition, and the Court cannot now consider them as the basis-either in whole or in part-for its claims against Espada. See Merchants Fast Motor Lines, 939 S.W.2d at 141 ("If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured.").
Additionally, the Court finds the Fifth Circuit's opinion in Admiral Ins. Co. v. Ford instructive. 607 F.3d 420 (5th Cir. 2010). In Admiral, the insured had contracted to provide professional services in drilling an oil well. The Fifth Circuit stated:
Aside from Exco's bald statement that certain (unspecified) acts were non-professional, the only arguably nonprofessional conduct alleged was failing to look for metal shavings or to use a magnet to detect shavings in mud. The actual performance of these acts is perhaps akin to conduct that we have found to be non-professional. But Exco is not suing Ford because Ford was told to watch for pipe wear and metal shavings and failed to do so. Rather, the complaint is that Ford failed to act upon its specialized knowledge that those tasks needed to be performed (i.e., Ford failed to instruct the mud logger to look for shavings). Indeed, the specific failures are listed as sub-parts of a general failure "to perform adequate and competent drilling operations." In other words, the allegations are not that Ford incorrectly performed some non-professional activity, but that Ford failed to properly implement a plan to drill a well over 16,000 feet deep.
Id. at 426. Here, even if the property damage was the result of a worker who fell asleep or dropped a tool-both non-professional *964 activities-CBX's state court petition specifically alleges that Espada failed "to perform[ ] oil and gas well drilling and completion services to deliver a producing well for [CBX]"-all indisputably professional tasks requiring specialized knowledge. Susman Godfrey, 982 S.W.2d at 476-77 ; see also Nicklos Drilling Co. v. Ace Am. Ins. Co., 2014 WL 6606575, at *3 (S.D. Tex. Nov. 5, 2014) (holding no duty to defend where plaintiff alleged conduct based only on failure to use specialized knowledge to prevent well blowout, but alleged no conduct based on non-professional services).[9]
Accordingly, because CBX's allegations in the petition are subject to the policy exclusion for professional services, the Court concludes that Ace American does not have a duty to defend Espada in the underlying case on this basis either.
C. Whether Ace Property Had a Duty to Defend Under the Umbrella Policy
Ace Property moves for summary judgment on the issue of whether it had a duty to defend Espada under the terms of the Umbrella Policy. (Dkt. # 17 at 28.) Ace Property contends that exclusion E(5) in the Umbrella Policy is identical in language to the exclusion in paragraph j(5) of the CGL Policy, and also that the Umbrella Policy's Professional Service Exclusion is substantially the same as the one in the CGL Policy, discussed above. (Id. ) Ace Property argues that for the same reasons identified above, the Court should find that the Umbrella Policy and its Professional Services Exclusion preclude coverage for the underlying suit. (Id. ) In addition, Ace Property contends that the Umbrella Policy's Oil and Gas Industries Limitation Endorsement precludes coverage for underlying case. (Id. )
For the same reasons discussed herein, as stated above, the Court finds that exclusion e(5) in the Umbrella Policy and its Professional Services Exclusion[10] preclude coverage for the underlying case. As for the Oil and Gas Industries Limitation Endorsement, stating that the Umbrella Policy does not apply to "any injury, damage, expense, cost, 'loss,' liability or legal obligation for any ... "[l]oss of damage to ... "[a]ny well, hole, formation, strata or area in or through which exploration for any production of any substance is carried on," the Court arrives at the same conclusion. As discussed, CBX's state court petition clearly alleges such damage to the Well and its casing therein, which is precluded from coverage under the Oil and Gas Industries Limitation Endorsement. (See Dkt. # 21-8.) Accordingly, the Court concludes that the underlying case is not covered by the Umbrella Policy, and Ace Property had no duty to defend Espada.
Based on the foregoing, the Court finds that Ace American and Ace Property had no duty to defend Espada in the underlying *965 case. The Court will GRANT Ace's motion for partial summary judgment on this issue (Dkt. # 17), and DENY CBX's motion for partial summary judgment (Dkt. # 16).
D. CBX's Objections and Motion to Strike Ace's Summary Judgment Evidence
CBX objects to seven of Defendants' exhibits offered in support of summary judgment. (Dkt. # 22.) First, CBX objects to the declaration of Manuel Mungia, Jr., on the basis that he has attempted to authenticate documents, attached as exhibits to his declaration, without any personal knowledge of them. The Court finds this objection mostly meritless-the bulk of documents attached to Mr. Mungia's declaration are public court filings from the underlying case. Additionally, the Fifth Circuit has recently ruled that, at the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. Lee, 859 F.3d at 355. In any case, in ruling on Ace's motion for summary judgment, the Court only reviewed CBX's Second Amended Complaint and the Ace Policies at issue in this case; the Court did not consider any of the other attachments to Mr. Mungia's declaration. This objection is OVERRULED .
CBX next objects to Ace's exhibits 2 through 9, on the basis that they are not relevant under Rule 402 of the Federal Rules of Evidence. (Dkt. # 22 at 2.) CBX also objects to Ace's exhibits 3 through 9, on the basis that they are inadmissible hearsay and not properly authenticated. However, the Court, in making its ruling on Ace's partial summary judgment motion, did not rely on the evidence that CBX now objects to and moves to strike. In accordance with the eight-corners rule, discussed above, the Court relied mainly on CBX's Second Amended Petition (Dkt. # 21-8), as well as on the two Ace Policies in question (Dkt. # 8-1, Dkt. # 17-1 at 9). Therefore, the Court finds each objection to be without merit and OVERRULES the objections and DENIES the motion to strike (Dkt. # 22).
CONCLUSION
Because the Court has found that the CGL Policy does not apply to the type of "property damage" alleged by CBX, Ace did not have a duty to defend Espada in the underlying case. Accordingly, based on the foregoing, the Court: (1) GRANTS Ace's Motion for Partial Summary Judgment on Ace's Duty to Defend (Dkt. # 17); (2) DENIES CBX's Motion for Partial Summary Judgment (Dkt. # 16), and (3) OVERRULES CBX's Objections to and Motion to Strike Evidence in Support of Defendants Motion for Partial Summary Judgment (Dkt. # 22).
IT IS SO ORDERED.

According to Ace, however, Espada had ceased doing any business operations sometime in 2012, due to a lack of funding. (See Dkt. # 17 at 5-6.)

CBX had apparently settled with the other defendants in the case. (See Dkt. # 17 at 8-9.)

Espada's causes of action against Ace American and Ace Property arise from their refusal to defend and indemnify Espada. (See Dkt. 16 at 11, Ex. P.)

CBX also argues that damage occurred to other tangible property, separate from the Well, including the lease, actual oil and gas, and its drilling operations. (Dkt. # 27 at 10.) CBX argues that coverage for these component parts of the Well cannot be excluded from coverage pursuant to paragraph j(5) of the CGL Policy. (Id. ) However, CBX's own pleadings in state court do not allege these damages directly as a result of Espada's physical injury to, and loss of use of, the Well. (See Dkt. # 21-8.) Instead, CBX sought to recover these damages as result of that property damage. (See id. at 9-10 ("[t]hese damages flow from the loss of its drilling operations due to the subsequent forced plugging and abandoning of the [Well]").) Furthermore, CBX has not presented sufficient evidence in its motion and its responses to Ace's motion-and Ace does not concede-that these alleged damages were "property damage" caused by an "occurrence" as defined in the CGL Policy.

Although not discussed in Bay Rock, the Oil & Gas Endorsement does not add coverage for property damage to real property within the defined "Underground Equipment Hazard," but does, however, appear to apply to personal property included in the exclusion in paragraph j(4) of the CGL Policy, as the Court has found so in this case. (See Dkt. # 17-3 at 89 (stating that the insurance "does not apply to ... 'Property Damage' included within the 'Underground Equipment Hazard," but that "[e]xclusion j(4) ... does not apply to this hazard.").)

CBX contends that the UREC Endorsement provides coverage because the "Underground Resources Hazard" defines the real property damaged in this case. (Dkt. # 21 at 15.) "Underground Resources Hazard" is defined as "property damage" to "[a]ny well, hole, formation, strata, or area in or through which exploration for or production of any substance is carried on." (Dkt. # 8-1 at 54.) The Court disagrees with CBX's contention, finding that the UREC Endorsement narrows the exclusion in paragraph j(4) by providing coverage for damage to certain real property not already included in paragraph (j)(5)'s exclusion-such as underground damage to real property on which Espada's operations are not being performed. Examples of this include damage to neighboring minerals, wells, holes, or formations that result from Espada's operations on the Well that may occur as a result of horizontal drilling or "frackquakes."

Ace American informs the Court of one value to the insured of this interpretation of the UREC Endorsement's additional coverage to personal property: "[a] well operator such as Espada will routinely have in its care, custody, or control, personal property (such as pipes, drill bits, and other well-servicing machinery) that could potentially be damaged in the course of its drilling operations" and that the endorsement "provides coverage for claims against the insured for damage to those types of personal property." (Dkt. # 29 at 9.)

CBX has failed to cite any authority for this proposition.

The cases CBX cites in support of its contention that Espada's drilling and completion services constituted non-professional services are inapposite and do not completely support CBX's position. See Willbros RPI, Inc. v. Cont'l Cas. Co., 601 F.3d 306, 310 (5th Cir. 2010) (underlying state court petition clearly alleged both professional and non-professional duty based on a failure to "use ordinary care"); Hartford Cas. Ins. Co. v. DP Eng'g, L.L.C., 827 F.3d 423, 427-30 (5th Cir. 2016) (finding professional services exclusion precluded coverage and insurer had no duty to defend). In this case, CBX clearly and explicitly alleged only negligence in professional services, and supported those claims with an affidavit from a licensed engineer who stated the same. (See Dkt. # 21-5; Dkt. # 21-8.)

As Ace Property contends, the wording of the Umbrella Policy's exclusion e(5) and its Professional Services Exclusion are identical, or very similar, to the wording of the same in the CGL Policy. (See Dkt. # 17-1 at 14; Dkt. # 17-2 at 13.) CBX does not dispute this. (See Dkt. # 21 at 27.)